Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
06/06/2023 09:07 AM CDT

Doug Watson et al., appellees, v.
Michael R. Pick, appellant.

___ N.W.2d ___

Filed May 30, 2023.    No. A-22-203.

1. **Restrictive Covenants: Equity.** An action to enforce restrictive covenants is equitable in nature.
2. **Equity: Appeal and Error.** On appeal from an equity action, an appellate court decides factual questions de novo on the record and, as to questions of both fact and law, is obligated to reach a conclusion independent of the trial court's determination. However, where the credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the circumstances that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.
3. **Actions: Parties: Standing: Jurisdiction.** Before a party is entitled to invoke a court's jurisdiction, that party must have standing to sue, which involves having some real interest in the cause of action.
4. **Actions: Parties: Standing.** Whether a party who commences an action has standing and is therefore a real party in interest is jurisdictional. Because the requirement of standing is fundamental to a court's exercise of jurisdiction, either a litigant or a court can raise the question of standing at any time.
5. **Jurisdiction.** While parties cannot confer subject matter jurisdiction upon a judicial tribunal by either acquiescence or consent, nor may subject matter jurisdiction be created by waiver, estoppel, consent, or conduct of the parties, such does not prevent a party from conclusively admitting the truth of an underlying fact required to establish subject matter jurisdiction by judicial admission.
6. **Pleadings: Evidence: Words and Phrases.** A judicial admission is a formal act done in the course of judicial proceedings which is a substitute for evidence, thereby waiving or dispensing with the production

of evidence by conceding for the purpose of litigation that the proposition of fact alleged by the opponent is true.

7. **Trial: Attorney and Client.** Statements made by a party or the party's attorney during the course of a trial may be judicial admissions.

8. **Actions: Stipulations.** Parties are bound by stipulations that are voluntarily made, and relief from such stipulations is warranted only under exceptional circumstances.

9. **Actions: Pleadings: Notice.** Nebraska is a notice pleading jurisdiction. Civil actions are controlled by a liberal pleading regime; a party is only required to set forth a short and plain statement of the claim showing that the pleader is entitled to relief and is not required to plead legal theories or cite appropriate statutes so long as the pleading gives fair notice of the claims asserted.

10. **Motions to Dismiss: Pleadings.** To prevail against a motion to dismiss for failure to state a claim, a plaintiff must allege sufficient facts, accepted as true, to state a claim to relief that is plausible on its face.

11. **Restrictive Covenants: Waiver.** The right to enforce restrictive covenants may be lost by waiver or acquiescence or violation of the same. Whether there has been such a waiver or acquiescence depends upon the circumstances of each case.

12. ____: ____. Generally, mere acquiescence in the violation of a restrictive covenant does not constitute an abandonment thereof, so long as the restriction remains of any value, and a waiver does not result unless there have been general and multiple violations without protest.

13. **Restrictive Covenants: Intent.** The enforcement of valid restrictive covenants may be denied only when noncompliance is so general as to indicate an intention or purpose to abandon the condition.

14. **Restrictive Covenants: Waiver.** The criteria for determining whether a waiver of a restrictive covenant has occurred include, but are not limited to, whether those seeking to enforce the covenants had notice of the violation and the period of time in which no action was taken, the extent and kind of violation, the proximity of the violations to those who complain of them, any affirmative approval of the same, whether such violations are temporary or permanent in nature, and the amount of investment involved.

15. **Restrictive Covenants: Intent.** Restrictive covenants are to be construed so as to give effect to the intentions of the parties at the time they agreed to the covenants.

16. **Restrictive Covenants.** If the language of a restrictive covenant is unambiguous, the covenant shall be enforced according to its plain language, and the covenant shall not be subject to rules of interpretation or construction.

17. ____. Restrictive covenants are not favored in the law and, if ambiguous, should be construed in a manner which allows the maximum unrestricted use of the property.

18. **Contracts: Words and Phrases.** Ambiguity exists in a document when a word, phrase, or provision in the document has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings.

19. **Restrictive Covenants: Intent.** Restrictive covenants are to be construed in connection with the surrounding circumstances, which the parties are supposed to have had in mind at the time they made it; the location and character of the entire tract of land; the purpose of the restriction; whether it was for the sole benefit of the grantor or for the benefit of the grantee and subsequent purchasers; and whether it was in pursuance of a general building plan for the development of the property.

20. **Injunction.** Injunctions should never be broader than necessary to afford complete relief to the plaintiffs.

Appeal from the District Court for Washington County: John E. Samson, Judge. Affirmed.

Rex J. Moats, of Moats Law Firm, P.C., L.L.O., for appellant.

Brad Entwistle and David P. Wilson, of Walentine O'Toole, L.L.P., for appellees.

Pirtle, Chief Judge, and Riedmann and Arterburn, Judges.

Pirtle, Chief Judge.

## INTRODUCTION

Michael R. Pick, a property owner and resident of the Spring Valley subdivision in Fort Calhoun, Nebraska, appeals from an order of the district court for Washington County granting a petition for permanent injunction filed on behalf of 11 other residents of the Spring Valley subdivision (collectively appellees). For the reasons that follow, we affirm.

## BACKGROUND

On March 11, 2020, appellees filed a petition for permanent injunction in the district court, alleging that Pick was

violating a number of restrictive covenants applicable to residents of the Spring Valley subdivision and requesting a permanent injunction restraining Pick from continued violations of the "Spring Valley Protective Covenants" (protective covenants). Appellees' position was that Pick was violating paragraphs III and VI of the protective covenants. Paragraph III of the protective covenants contains two clauses, the first of which provides that "[n]o business, trade, or commercial activity shall be carried on upon any residential lot." The second clause of paragraph III provides that "[n]o noxious or offensive activity shall be carried on upon any lot, nor shall anything be done thereon which may be or may become an annoyance or nuisance to the neighborhood." Paragraph VI also contains two clauses, the first of which provides that "[n]o trash, junk cars or other refuse may be thrown or dumped on any lot." The second clause of paragraph VI provides that "[e]ach owner of a vacant lot is required to keep said lot in presentable condition and any non-burnable refuse must be hauled away for disposal."

With regard to the enforceability of the protective covenants, paragraph IX provides that the covenants "are to run with the land and shall be binding on all parties and all persons claiming under them . . . unless an instrument signed by a majority of the then owners of said lots has been recorded, agreeing to change said covenants in whole or in part." Paragraph X further provides:

> If the parties hereto, or any of them, or their heirs or assigns shall violate any of the covenants herein, it shall be lawful for any person or persons owning any of the above described property to prosecute any proceedings at law or in equity against the person or persons violating or attempting to violate any such covenant to either prevent him or them from so doing or recover damages for such violation.

Acting pro se, Pick filed an answer to appellees' petition, denying the pertinent allegations and counterclaiming

for damages resulting from harassment and "[v]iolation of [Pick's] civil rights, liberties and freedoms." On May 4, 2020, appellees filed a motion to dismiss Pick's counterclaim for failure to state a claim upon which relief can be granted. Appellees argued that Pick failed to allege "when these alleged violations and harassment occurred or which of the eleven [appellees] committed them."

The court granted appellees' motion to dismiss Pick's counterclaim on June 17, 2020, but allowed Pick until July 2 to file an amended counterclaim. Pick filed an amended counterclaim on July 2, alleging that "a small group of surrounding residents of the Spring Valley subdivision have stalked, harassed, and in general have been nuisances, towards . . . Pick [in] violation of . . . Picks' [sic] basic covenants and rights" to quiet enjoyment of his property. Pick further alleged various incidents in which "surrounding residents" trespassed upon his property and took pictures of Pick and the property, as well as one specific incident in June 2020 in which a named individual was caught on Pick's property and cited for criminal trespass. However, that named individual was not a party to appellees' petition. Pick ultimately sought an order requiring each appellee to pay "punitive damages" in the amount of $10,000.

On August 13, 2020, appellees filed a motion to dismiss Pick's amended counterclaim for failure to state a claim upon which relief can be granted and filed a motion for summary judgment against Pick on the original petition. With regard to the motion to dismiss, appellees alleged that Pick failed to cure the defects in his original counterclaim, because Pick still had not identified when the alleged conduct occurred or which of the 11 appellees were alleged to have engaged in such conduct. On February 24, 2021, the court entered orders granting appellees' motion to dismiss Pick's amended counterclaim and denying appellees' motion for summary judgment.

With regard to the motion to dismiss, the court characterized Pick's amended counterclaim as containing claims

of trespass, stalking, and harassment against "surrounding residents." The court noted that the only individual named in Pick's amended counterclaim was an individual that was not a party to the present action. The court ultimately concluded that Pick failed to "specifically allege any harassment, stalking, or trespass violation by any [appellees] to this lawsuit," and thus granted appellees' motion to dismiss the amended counterclaim.

With regard to the motion for summary judgment, the court found genuine issues of material fact as to whether (1) Pick was carrying on a business, trade, or commercial activity on the property; (2) Pick's activities created an annoyance or nuisance to the neighborhood; and (3) Pick had thrown or dumped trash, junk cars, or other refuse on the lot. Notably, whether the protective covenants were applicable to the parties and whether appellees had standing to bring the suit were not disputed facts for trial.

On August 13, 2020, appellees filed a statement of undisputed facts in support of summary judgment, which asserted, inter alia, that the protective covenants were in full force and effect and that appellees "have the right and standing to enforce" them. Thereafter, on October 22, Pick filed a case brief opposing summary judgment in which he specifically asserted that "all transferees, grantees, and successors in title" in the Spring Valley subdivision are subject to the protective covenants, "including, among others, [appellees] and [Pick]." After reciting the enforcement provisions quoted above, Pick added that the protective covenants "continue to run with the land, including but not limited to the land in Spring Valley Subdivision owned by [appellees] and [Pick], and are at the date hereof and [at] all relevant times to these proceedings in full force and effect."

A telephonic hearing was held on October 22, 2020, but there is no record of that hearing on appeal. The day after that hearing, the district court entered a journal entry memorializing that appellees and Pick had stipulated on the record

that the protective covenants at issue were "in full force and effect." In its order denying appellees' motion for summary judgment, the court noted that the parties had stipulated that the protective covenants "are at the date hereof and at all relevant times to these proceedings in full force and effect" and that "among others, [appellees] and [Pick]" are subject to the protective covenants. Finally, at the start of trial, the court once again confirmed with all the parties that there was "no issue that the [protective covenants] are in full force and effect at this time."

Trial was held on December 8 and 9, 2021. The first witness to testify at trial was appellee Christine M. Ostronic, who testified that she had lived in the Spring Valley subdivision for 34 years. Ostronic recalled that Pick moved into an adjacent lot in 2010, and she noticed a continuous stream of what she described as "junk cars" being hauled onto Pick's property beginning in 2011. Ostronic estimated that Pick started with 20 to 50 vehicles in 2011, but that the number had increased to approximately 150 vehicles covering "[e]very inch" of Pick's property at the time of trial. Ostronic testified that the vehicles consisted of "[v]arious sizes of trucks" and other heavy machinery.

Ostronic testified that she took pictures of Pick's property at various times between 2012 and 2021, for the purpose of documenting the accumulation of vehicles on Pick's property and the activities in which Pick was engaged. Ostronic explained that a number of the pictures depict vehicles or vehicle parts located on the road outside of Pick's property at times when there was apparently "no room" to put the items on Pick's property. A number of Ostronic's pictures were admitted as evidence and frequently referenced throughout trial. Additional photographic evidence admitted at trial included aerial images of Pick's property from 2020 and 2021, both of which depict numerous vehicles scattered throughout the property.

Ostronic testified that she can hear people working on the vehicles at the property up to 5 days a week for roughly 8 hours a day. Ostronic described people helping Pick "remove vehicles, cut them apart, load them on trailers, load them off trailers, [and] move scrap around." Ostronic indicated that these activities produced a substantial amount of noise, which she could hear from both inside and outside of her house. Ostronic also recalled at least two reports of catalytic converter thefts on Pick's property. Ostronic ultimately opined that Pick kept "[j]unk, scrap" on his property and that Pick's activities were noxious and an annoyance to the neighborhood.

The next witness was appellee Nancy Watson, who testified that she had lived in the Spring Valley subdivision for almost 44 years. Watson recalled "[j]unk cars coming in and out" beginning within a couple years of Pick's moving into the subdivision around 2010 or 2011. Watson testified that she can see Pick's property while driving on the surrounding roads, and she estimated there were approximately 150 trucks of various sizes and conditions on his property at the time of trial. Watson testified that Pick's activities on the property had only increased in recent years, and she described the property as an "eyesore" and a "junkyard." Watson concurred with Ostronic that Pick's property had become "a nuisance" to the neighborhood. Like Ostronic, Watson took pictures to document Pick's activities and the state of his property over time. Watson recalled that she likewise took pictures at various times between 2012 and 2021, but only six of those pictures, taken between April and October 2021, were admitted as evidence at trial. Those six pictures depicted similar scenes to the pictures taken by Ostronic, with "trucks carrying scrap bumpers, tires, fenders, . . . junked vehicles, . . . [w]recked vehicles, . . . a Bobcat [and] a bunch of junk."

The next witness was appellee Linda M. Dugan, who testified that she and her husband, appellee John P. Dugan, had lived in the Spring Valley subdivision for approximately 6

years, making her the first witness to have moved into the subdivision after Pick. Linda testified that they purchased the property in the summertime and that it was difficult to see Pick's property through the trees' leaves at the time. However, when they moved into the subdivision that winter, she then noticed the "junkyard and the junk vehicles" on Pick's property. Linda and John both testified that they would not have purchased the property if they had known about the condition of Pick's property at the time.

When asked to describe the activity she had observed on Pick's property, Linda testified that the property "appears to be fully engulfed in a massive amount of vehicles in different stages [of disrepair]," adding that Pick's activity had only increased over time. As with the previous witnesses, Linda opined that the property was "a nuisance" to the neighborhood and "an eyesore." Linda further expressed concern "for the long-term value of all of our properties [and] the continuation of potential theft being generated by [Pick's] business." Linda explained that she was personally aware of at least one report of a catalytic converter theft on Pick's property.

Pick was the next witness, and he testified that he owned several businesses, including "Main Street Auto Sales" (Main Street Auto) located in Wayne, Nebraska. Pick explained that he purchased Main Street Auto around 2 years prior to trial, and he maintained a used car dealer's license through that business. According to Pick's own testimony, his business activities through Main Street Auto involved the substantial use of his Spring Valley subdivision property. Pick testified that he buys vehicles from "all over the world" and stores them on his property while he works on them and that he then sells those vehicles under the dealer's license maintained through Main Street Auto. Pick testified that prior to purchasing Main Street Auto, he conducted a similar operation for around 6 years through a pawnshop that he owned. When asked if he had been involved in the "used car business" prior to the pawnshop and Main Street Auto, Pick responded,

"Yes . . . I have been repairing, fixing wrecked vehicles since I was fifteen years old."

With regard to the state of his property, Pick estimated that he had 80 to 100 vehicles located on his property at the time of trial, along with "probably 20 pieces of machinery" like tractors, "Bobcats," and "approximately 15 tow trucks." Pick also confirmed that at the time he responded to appellees' discovery request, he had an inventory of roughly 134 vehicles stored at the property. However, Pick also testified that he buys, sells, and trades vehicles "every day," such that many of the vehicles on that inventory list had likely been relocated and replaced with new vehicles by the time of trial.

Pick confirmed that in 2013, he was convicted by a jury on charges that he violated zoning regulations by operating a "wrecking yard" and a "junk yard" on his property without a permit. Pick further confirmed that those convictions did not cause any change in his activities on the property, "Because in my mind I was doing nothing wrong." Pick was cited again for zoning violations in 2016, but the charges were eventually dropped. A number of the other witnesses also noted that despite two misdemeanor convictions and a subsequent criminal citation, the degree of Pick's activities seemed to only increase over time.

After examining Pick, appellees rested their case in chief. Pick moved for a directed verdict, which motion the court denied, and then Pick called various witnesses in his own behalf. Pick first called appellee Richard A. Schmitt. Schmitt joined the previous witnesses in describing Pick's property as "a nuisance to the neighborhood" and "an eyesore." Upon examining the pictures taken by Ostronic and Watson, Schmitt further described the property as "cluttered," "obnoxious," "messy," and "very unorganized." Schmitt noted that the pictures depicted vehicle parts, partial vehicles, damaged vehicles, heavy machinery, trucks carrying vehicles, and vehicles parked in every direction.

Pick next called appellee John Dugan, who identified Pick's property as a "junkyard" and described it as "an eyesore," "unsightly," and "upsetting." As with Schmitt, Pick had John examine the pictures taken by Ostronic and Watson. John indicated that none of the individual pictures captured the totality of Pick's property, which John described as "a big open area with a lot of ugly mess." Pick then called additional appellees—Stacy DeVries, Russell J. DeVries, Kevin Swisher, and Pamela Swisher—all of whom generally reiterated the testimony of the previous witnesses.

Pick also called A.J. Watson, the son of two appellees, who confirmed that he started a landscaping business about 22 years prior, when he was in high school and living at his parents' Spring Valley subdivision address. A.J. explained that at that time he would mow lawns for the surrounding neighbors, who would pay $40 for his services. A.J. further testified that at that time he "was just a kid that would mow the neighbors' lawn because I needed money," whereas his current landscaping business was a much larger enterprise that operated out of an address in Omaha, Nebraska.

Thereafter, Pick testified once again, focusing his attention on the argument that appellees had waived enforcement of paragraph III of the protective covenants on account of general noncompliance with the prohibition on "business, trade, or commercial activity" within the subdivision. Pick offered exhibit 73, which purported to contain a list of active and inactive businesses with a connection to Spring Valley subdivision addresses. Pick testified that exhibit 73 was prepared by his sister and that exhibits 74 through 88 represented Pick's attempts to verify the businesses on that list using primarily internet searches. Exhibits 75, 76, 78, 79, and 86 through 88 were not admitted into evidence for various evidentiary reasons. The remaining exhibits generally consisted of ostensible connections between a number of the businesses on Pick's list and Spring Valley subdivision addresses, but there was no evidence of actual business activities being carried on

at those addresses. Pick ultimately stated the following regarding the aforementioned exhibits:

> I understand that most of these exhibits came from the Internet and we all know the Internet tells you what it wants to tell you . . . . I haven't met any of these people, I've never done business with them, I don't know what business they're in and, you know, I'm taking it at face value. The Internet is not always right, but it's pretty accurate to a certain extent.

Excluding the allegations regarding Pick's property, none of the witnesses could identify any other businesses operating within the subdivision.

In lieu of closing arguments, the court ordered the parties to submit written briefs. Pick reiterated in his closing brief that "[appellees] and [Pick]" are subject to the protective covenants. The court entered its final order on February 28, 2022, which granted appellees' petition for permanent injunction. The court first examined the language of the protective covenants in light of Pick's argument that a number of the terms were ambiguous. Pick took particular issue with the allegation that there were "junk cars" thrown or dumped on his property when the evidence indicated that Pick owned exclusively trucks. Pick argued the term "junk cars" was ambiguous as applied to him, suggesting that the term "junk vehicles" was less ambiguous and should have been used. The court ultimately determined that the protective covenants at issue were unambiguous, as the terms used were "all words an ordinary person understands and should be given their plain meaning." Thus, the court went on to apply the protective covenants to the evidence of Pick's activities, relying primarily on dictionary definitions of operative terms to ascertain their plain meaning.

With respect to the first clause of paragraph III, the court found that Pick was clearly engaged in a business, trade, or commercial activity at his Spring Valley property, to wit: storing, repairing, and "'parting out'" used vehicles to be sold

at another location. The court further found that Pick failed to show other business activity in the subdivision of "a degree which would waive enforceability of the Protective Covenant against [Pick's] residential lot." The court acknowledged the various exhibits offered by Pick in that regard, but the court also noted that much of that evidence lacked credibility. The court emphasized that aside from the operation on Pick's property, none of the numerous witnesses could identify any business activity occurring within the Spring Valley subdivision. With respect to the second clause of paragraph III, the court wrote: "Many neighbors testified and the Court finds from credible testimony that the business activity carried on by [Pick] was reasonably offensive to the neighborhood" and "certainly could reasonably be described to be an annoyance or nuisance to the neighborhood."

With respect to paragraph VI of the protective covenants, the court found that the plain meaning of the term "junk cars" was "not limited to passenger cars but was intended to mean 'junk vehicles.'" Accordingly, the court rejected Pick's proposed distinction between "junk cars" and "junk trucks" and found that "[t]he testimony of [appellees] and the photographic evidence presented at trial showed all types of junk vehicles on the property." Altogether, the court concluded that appellees had met their burden to prove that Pick was violating paragraphs III and VI of the protective covenants, and it thus granted appellees' request for a permanent injunction.

The court ordered that Pick be immediately and permanently enjoined from continuing to violate the protective covenants in the manner described above and included a detailed outline of the court's expectations in that regard. The court crafted a mitigation timetable, according to which Pick was to gradually remove the "junk vehicles" from his property over the course of 4 months. The court further ordered that up to six appellees, along with counsel, be allowed to enter Pick's property under specified circumstances to verify compliance with the injunction. Finally, the court ordered that Pick may

store any number of "personal non-commercial motor vehicles" inside the storage buildings located on the property but shall be limited to "no more than 3 personal motor vehicles" parked outside of those buildings. Pick appealed.

## ASSIGNMENTS OF ERROR

Pick assigns, restated, that the district court erred in (1) determining that the protective covenants applied and that appellees had standing to sue, (2) dismissing Pick's amended counterclaim, (3) failing to find that enforcement of paragraph III of the protective covenants had been waived, (4) finding that the terms "noxious or offensive" and "annoyance or nuisance" were not ambiguous, (5) finding that Pick violated paragraph VI of the protective covenants, and (6) crafting a permanent injunction that was overbroad.

## STANDARD OF REVIEW

[1,2] An action to enforce restrictive covenants is equitable in nature. *Estates at Prairie Ridge Homeowners Assn. v. Korth*, 298 Neb. 266, 904 N.W.2d 15 (2017). On appeal from an equity action, an appellate court decides factual questions de novo on the record and, as to questions of both fact and law, is obligated to reach a conclusion independent of the trial court's determination. *Id.* However, where the credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the circumstances that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *State v. Melcher*, 240 Neb. 592, 483 N.W.2d 540 (1992).

## ANALYSIS

*Subject Matter Jurisdiction.*

Pick first assigns that the district court erred in determining that the protective covenants applied to the parties and that appellees had standing to sue Pick for violation thereof. Pick does not dispute the parties' stipulation that the protective covenants were in full force and effect at all pertinent

times. Rather, Pick suggests that the stipulation improperly conferred subject matter jurisdiction upon the district court by consent or acquiescence of the parties. Having characterized the issue as jurisdictional, Pick asserts he "is permitted to raise the issue of [appellees'] lack of standing and consequent lack of subject matter jurisdiction at this stage in the proceedings." Brief for appellant at 22.

[3] In support of his position, Pick cites *Marcuzzo v. Bank of the West*, 290 Neb. 809, 862 N.W.2d 281 (2015), for the proposition that "subject matter jurisdiction requires that the party have standing to sue, which involves a real interest in the cause of action." Brief for appellant at 20. It is true that the court in *Marcuzzo* stated, "Before a party is entitled to invoke a court's jurisdiction, that party must have standing to sue, which involves having some real interest in the cause of action." *Marcuzzo v. Bank of the West*, 290 Neb. at 819, 862 N.W.2d at 289. However, we disagree with Pick's suggestion that stipulating to the facts underlying appellees' standing to sue was tantamount to conferring subject matter jurisdiction by consent.

[4-8] We have said that the question of whether a party who commences an action has standing and is therefore a real party in interest is jurisdictional and that because the requirement of standing is fundamental to a court's exercise of jurisdiction, either a litigant or a court can raise the question of standing at any time. *Jacobs Engr. Group v. ConAgra Foods*, 301 Neb. 38, 917 N.W.2d 435 (2018). While parties cannot confer subject matter jurisdiction upon a judicial tribunal by either acquiescence or consent, nor may subject matter jurisdiction be created by waiver, estoppel, consent, or conduct of the parties, such does not prevent a party from conclusively admitting the truth of an underlying fact required to establish subject matter jurisdiction by judicial admission. *Id.* A judicial admission is a formal act done in the course of judicial proceedings which is a substitute for evidence, thereby waiving or dispensing with the production of evidence by

conceding for the purpose of litigation that the proposition of fact alleged by the opponent is true. *Id.* Statements made by a party or the party's attorney during the course of a trial may be judicial admissions. *Schroeder v. Barnes*, 5 Neb. App. 811, 565 N.W.2d 749 (1997). Parties are bound by stipulations that are voluntarily made, and relief from such stipulations is warranted only under exceptional circumstances. *Shearer v. Shearer*, 270 Neb. 178, 700 N.W.2d 580 (2005).

In this case, Pick stipulated by judicial admission that the protective covenants were in full force and effect at all pertinent times and that appellees and Pick were subject thereto. Prior to trial, appellees and Pick affirmatively alleged in court filings that the protective covenants were in full force and effect and binding upon all the parties. It was thus not surprising that shortly after those documents were filed, the parties stipulated on the record to that fact. Pick then emphasized throughout trial that the protective covenants were applicable and binding upon all the parties including himself, because a central component of his defense revolved around the protective covenants being enforceable against appellees. While Pick now wishes to litigate these issues, the time to do so has passed. The fact that the parties stipulated to an underlying fact that was required to establish subject matter jurisdiction does not deprive the district court of the same. Thus, we reject Pick's first assignment of error.

*Motion to Dismiss Amended Counterclaim.*

Pick next assigns that the district court erred in granting appellees' motion to dismiss Pick's amended counterclaim. Pick does not dispute his "failure to specifically name any of the individual [appellees] in his amended counterclaim." Brief for appellant at 24. Rather, Pick argues he referred to "surrounding residents" and that "should have reasonably been interpreted to refer to [appellees] as the individuals who violated his private use and enjoyment of his land." *Id*. We disagree.

[9,10] Nebraska is a notice pleading jurisdiction. *Vasquez v. CHI Properties*, 302 Neb. 742, 925 N.W.2d 304 (2019). Civil actions are controlled by a liberal pleading regime; a party is only required to set forth a short and plain statement of the claim showing that the pleader is entitled to relief and is not required to plead legal theories or cite appropriate statutes so long as the pleading gives fair notice of the claims asserted. *Id.* To prevail against a motion to dismiss for failure to state a claim, a plaintiff must allege sufficient facts, accepted as true, to state a claim to relief that is plausible on its face. *Id.*

In the present case, we agree with the district court that Pick's amended counterclaim failed to allege facts sufficient to give fair notice of the claims asserted. While Pick may have adequately alleged the conduct he complained of, he failed to allege when such conduct occurred or which of the individual appellees had engaged in such conduct. We decline Pick's invitation to simply interpret the claims against "surrounding residents" as having been leveled against appellees collectively. Moreover, even if we did accept that argument, Pick's allegations would still lack fair notice of claims asserted against individual appellees. Accordingly, we reject Pick's second assignment of error.

*Waiver and Acquiescence.*

Pick next assigns that the district court erred in concluding that paragraph III of the protective covenants was enforceable despite Pick's argument that appellees waived enforcement of that provision. Specifically, Pick argues that appellees were aware of the activity on his property for many years before filing suit and that appellees have acquiesced to the business activity of other Spring Valley subdivision residents in the meantime.

[11-14] It is well settled in most jurisdictions that the right to enforce restrictive covenants may be lost by waiver or acquiescence or violation of the same. *Pool v. Denbeck*, 196 Neb. 27, 241 N.W.2d 503 (1976). Whether there has been

such a waiver or acquiescence depends upon the circumstances of each case. *Id.* Generally, mere acquiescence in the violation of a restrictive covenant does not constitute an abandonment thereof, so long as the restriction remains of any value, and a waiver does not result unless there have been general and multiple violations without protest. *Farmington Woods Homeowners Assn. v. Wolf*, 284 Neb. 280, 817 N.W.2d 758 (2012). Thus, in order to prove a waiver, a defendant must prove that a plaintiff has waived the covenant through substantial and general noncompliance. *Id.* The enforcement of valid restrictive covenants may be denied only when noncompliance is so general as to indicate an intention or purpose to abandon the condition. *Id.* The criteria for determining whether a waiver of a restrictive covenant has occurred include, but are not limited to,

> "whether those seeking to enforce the covenants had notice of the violation and the period of time in which no action was taken; the extent and kind of violation; the proximity of the violations to those who complain of them; any affirmative approval of the same; whether such violations are temporary or permanent in nature; and the amount of investment involved."

*Id.* at 286-87, 817 N.W.2d at 765.

In the present case, Pick purported to introduce evidence of a number of businesses conducting business activities in the Spring Valley subdivision. However, the bulk of that evidence consisted of website printouts and internet searches revealing more or less tenuous links between Spring Valley subdivision addresses and either active or inactive businesses. Each of the witnesses who were posed with a question regarding business activity in the subdivision identified Pick's activities as the only apparent business operation. None of the evidence offered by Pick came even remotely close to demonstrating business activity within the subdivision that was similar in nature and degree to the activities on Pick's property.

Pick is correct to point out that multiple witnesses testified they became aware of his objectionable activities shortly after he moved to the subdivision in 2010 or 2011 and failed to sue until roughly 10 years later. However, those witnesses also testified that they repeatedly complained to the county authorities about the activities on Pick's property and that they hoped that two misdemeanor convictions and a subsequent criminal citation would cause Pick to curb the activities on his property. However, Pick's activities only increased, ultimately prompting appellees to join together and file their petition. Altogether, we agree with the district court that Pick failed to prove the sort of substantial and general noncompliance or acquiescence required to establish a waiver of the protective covenants. As such, we reject Pick's third assignment of error.

*Ambiguity.*

Pick's fourth and fifth assignments of error allege that the district court erred in its interpretation and application of paragraphs III and VI of the protective covenants. In his fourth assignment of error, Pick argues that the terms "noxious or offensive" and "annoyance or nuisance" were ambiguous and thus unenforceable. In his fifth assignment of error, Pick argues that the terms "trash, junk cars or other refuse" were ambiguous and thus unenforceable and that even if paragraph VI were enforceable, appellees failed to prove that Pick was violating the terms thereof.

[15-17] Restrictive covenants are to be construed so as to give effect to the intentions of the parties at the time they agreed to the covenants. *Southwind Homeowners Assn. v. Burden*, 283 Neb. 522, 810 N.W.2d 714 (2012). If the language is unambiguous, the covenant shall be enforced according to its plain language, and the covenant shall not be subject to rules of interpretation or construction. *Id.* However, restrictive covenants are not favored in the law and, if ambiguous, should be construed in a manner which allows the maximum unrestricted use of the property. *Id.*

[18,19] Ambiguity exists in a document when a word, phrase, or provision in the document has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings. *Estates at Prairie Ridge Homeowners Assn. v. Korth*, 298 Neb. 266, 904 N.W.2d 15 (2017). Restrictive covenants are to be construed in connection with the surrounding circumstances, which the parties are supposed to have had in mind at the time they made it; the location and character of the entire tract of land; the purpose of the restriction; whether it was for the sole benefit of the grantor or for the benefit of the grantee and subsequent purchasers; and whether it was in pursuance of a general building plan for the development of the property. See *Ross v. Newman*, 206 Neb. 42, 291 N.W.2d 228 (1980).

The protective covenants expressly declare that the Spring Valley subdivision lots "shall be known and designated as residential building plots" and that they were enacted "[f]or the purpose of providing adequate restrictive covenants for the mutual benefit of ourselves and successors in title." Turning to Pick's fourth assignment of error, the second clause of paragraph III of the protective covenants prohibits "noxious or offensive activity" and any activity that "may be or may become an annoyance or nuisance to the neighborhood." Notably, Pick's ambiguity argument pertains only to terms contained in the second clause of paragraph III, and Pick does not otherwise challenge the district court's finding that Pick also violated the first clause of paragraph III prohibiting business activity within the subdivision. Accordingly, even if we accepted Pick's argument as to the second clause, Pick's violation of the first clause would stand. In any case, we decline to accept Pick's argument that the second clause of paragraph III was ambiguous and thus unenforceable.

Pick argues that the terms at issue "do not refer to any particular kinds of activity" and "do not even describe the characteristics of activities which would come within the ambit of the terms." Brief for appellant at 32. Contrary to Pick's

assertions, we agree with the district court that the provision clearly and unambiguously encompasses activities which are characteristically "noxious or offensive" and particular kinds of activity that "may be or may become an annoyance or nuisance to the neighborhood." In the context of the protective covenants, these terms are unambiguous and should be accorded their plain and ordinary meaning as an ordinary or reasonable person would understand them. In light of that and the evidence adduced at trial, we agree with the district court that the activities on Pick's property could reasonably be described as noxious or offensive and an annoyance or nuisance to the neighborhood. Accordingly we reject Pick's fourth assignment of error.

With regard to Pick's fifth assignment of error, the first clause of paragraph VI of the protective covenants prohibits the throwing or dumping of any "trash, junk cars or other refuse" on subdivision lots. The district court narrowed in on the term "junk cars" and determined that term was unambiguous and "was intended to mean 'junk vehicles,'" thereby rejecting Pick's proposed distinction between the terms "junk cars" and "junk trucks." Having so interpreted that language, the court found an abundance of evidence showing "all types of junk vehicles on [Pick's] property."

Pick seeks to revive the proposed distinction between the terms "junk cars" and "junk trucks" on appeal. As appellees point out, "[i]f [Pick's] distinction is accepted, having a hundred 18-wheelers in your yard would be allowed while a hundred Toyota Priuses would be a violation." Brief for appellees at 34. Thus, we agree with appellees that Pick's "proposed distinction goes against common understanding of the words and against the intent of Paragraph VI." Brief for appellees at 33-34. Pick also suggests that the term "junk cars" should be interpreted narrowly to include only vehicles that were "useless" and being "discarded." Brief for appellant at 35. Pick acknowledges the numerous vehicles located on his property, including various "truck parts . . . tires and bumpers,"

but he argues those were not "junk cars" because they "were on the property to be repaired . . . and moved to another location" as opposed to simply being discarded. *Id.* We disagree.

The district court observed that "'junk'" is generally defined as "old iron, glass, paper, or other waste that may be used again in some form; secondhand, or worn and discarded articles; something of poor quality." The court further observed that "'car'" is generally defined as "a vehicle moving on wheels such as an automobile." In the context of the protective covenants, we conclude the term "junk cars" generally encompasses secondhand or used vehicles in a state of disrepair regardless of whether they are intended to be repaired and sold or simply discarded. Altogether, we agree with the district court that the term "junk cars" in paragraph VI of the protective covenants is unambiguous and clearly applies to the numerous vehicles that Pick routinely stored on his property. Accordingly, we reject Pick's fifth assignment of error.

*Permanent Injunction.*

[20] Finally, Pick assigns that the district court erred in crafting a permanent injunction which was broader than necessary to provide relief to appellees. See *Nolan v. Campbell*, 13 Neb. App. 212, 690 N.W.2d 638 (2004) (injunctions should never be broader than necessary to afford complete relief to plaintiffs). Pick takes issue with two particular provisions of the injunction: the limitation on the number of personal vehicles Pick is allowed to store outdoors on his property and the circumstances under which appellees were authorized to enter Pick's property to verify compliance with the injunction. In contrast, appellees argue that both of these provisions were necessary for enforcement of the injunction.

With respect to the limitation on personal vehicles, the court ordered that Pick may store any number of personal vehicles and other equipment inside the buildings and garage located on the property. Pick testified, and the photographic

evidence confirms, that his property contained two outbuildings along with a garage attached to the house. Pick testified that the smaller of the two outbuildings can store approximately 6 vehicles, and Pick estimated there were at least 13 vehicles in the larger outbuilding at the time of trial. Assuming the attached garage can store 1 or 2 vehicles, Pick could reasonably store up to 20 or more personal vehicles inside those buildings; however, the injunction limits Pick to no more than 3 personal vehicles parked outside of those buildings.

Pick argues that limitation sweeps too broadly, as it encompasses activity that does not necessarily violate the terms of the protective covenants (i.e., parking noncommercial personal vehicles outside on one's own property). Appellees counter that a limit on personal vehicles is necessary because Pick does not distinguish between vehicles owned in his personal capacity and those owned pursuant to his used car business. As such, appellees argue that absent a limitation on personal vehicles, Pick could continue to store any number of vehicles on the property and "simply say they are his personal vehicles." Brief for appellees at 36. In explanation for the limitation, the district court observed as follows:

> The Court acknowledges that under the [protective covenants], there is no restriction on the number of personal motor vehicles . . . that a person can possess on their Spring Valley property; provided however, the Court is also cognizant that [Pick], over approximately 12 years or so, stored well in excess of an average of 100 pieces of motor vehicles, equipment, junk, refuse, etc. on his property at any one time. . . . [P]rovided further that, the Court is also aware that [Pick] was prosecuted and found guilty of Washington County Zoning Regulations in regard to junk vehicles and other junk on his property, and thereafter, his storage of trash, junk, junk vehicles, salvage materials, refuse, unlicensed motor vehicles, an [sic] inoperable motor vehicles/trailers/trucks/buses, motor vehicle parts or tires, equipment **increased** after the

successful prosecution against him. With this in mind, the Court finds that in order to prevent further violations of the Protective Covenants by [Pick] that it is necessary to set forth limitations on personal motor vehicles [Pick] will be allowed to have on [his] property.

(Emphasis in original.) We agree with the district court's well-reasoned analysis, and we conclude that, under the circumstances of this case, the limitation on personal vehicles allowed to be stored outdoors on Pick's property was not overbroad and was necessary to afford complete relief to appellees.

With respect to the verification procedure, the court ordered that "counsel for [appellees] and up to six (6) of [appellees] shall be allowed to enter upon [Pick's] property, on or before August 15, 2022," for the purpose of verifying Pick's compliance with the injunction. The court further ordered that appellees must file a written notice, at least 7 days in advance, "setting forth the specific date, time . . . and names of persons" conducting the inspection. The court also specified that the inspection shall not include entry into Pick's residence or attached garage. Under the circumstances of this case, we conclude that the verification procedure crafted by the district court was not overbroad and was necessary to afford complete relief to appellees. Accordingly, we reject Pick's sixth assignment of error.

## CONCLUSION

For the foregoing reasons, we affirm the order of the district court in its entirety.

AFFIRMED.