Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/10/2024 06:10 PM CDT

- 881 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
DIBUONO-GONZALEZ V. GONZALEZ
Cite as 32 Neb. App. 881

Christina Dibuono-Gonzalez, appellee,
v. Daniel Gonzalez, appellant.

___ N.W.3d ___

Filed May 21, 2024.    No. A-23-439.

1. **Divorce: Child Custody: Child Support: Property Division: Alimony: Attorney Fees: Appeal and Error.** In an action for the dissolution of marriage, an appellate court reviews de novo on the record the trial court's determinations of custody, child support, property division, alimony, and attorney fees; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of discretion.

2. **Antenuptial Agreements.** As a contract, an antenuptial agreement is governed by the same principles that are applicable to other contracts, but is subject to the particular statutory requirement that an antenuptial agreement must be based on fair disclosure.

3. **Contracts: Intent.** When the terms of a contract are clear, a court may not resort to rules of construction, and terms are accorded their plain and ordinary meaning as an ordinary or reasonable person would understand them. In such a case, a court shall seek to ascertain the intention of the parties from the plain language of the contract.

4. **Divorce: Property Division.** Equitable distribution of property is a three-step process: The district court (1) classifies the parties' property as marital or nonmarital, setting aside nonmarital property to the party who brought the property to the marriage; (2) values the marital assets and marital liabilities of the parties; and (3) calculates and divides the net marital estate between the parties in accordance with the principles contained in Neb. Rev. Stat § 42-365 (Reissue 2016).

5. **____: ____.** All property accumulated and acquired by either spouse during the marriage is part of the marital estate, unless it falls within an exception to this general rule.

6. **Antenuptial Agreements: Property Division.** Spouses are able to contract around the general rules of equitable division by using a premarital agreement.

- 882 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
DIBUONO-GONZALEZ V. GONZALEZ
Cite as 32 Neb. App. 881

7. **Divorce: Property Division.** Any given property can constitute a mixture of marital and nonmarital interests; a portion of an asset can be marital property while another portion can be separate property.
8. **Property Division: Proof.** The burden of proof to show that property is nonmarital remains with the person making the claim.
9. **Child Custody.** In determining child custody issues, the overriding consideration is the best interests of the children.

Appeal from the District Court for Sarpy County: STEFANIE A. MARTINEZ, Judge. Affirmed as modified.

Ryan P. Watson, of Gross, Welch, Marks & Clare, P.C., L.L.O., for appellant.

Donald A. Roberts, of Roberts Law, L.L.C., for appellee.

PIRTLE, Chief Judge, and RIEDMANN and WELCH, Judges.

RIEDMANN, Judge.

## I. INTRODUCTION

Daniel Gonzalez (Daniel) appeals the decree of the Sarpy County District Court that dissolved his marriage to Christina Dibuono-Gonzalez (Christina), divided the marital estate, and awarded custody of their minor children. We find that the district court abused its discretion in determining the proceeds from Christina's nonmarital house remained her separate property absent evidence that the proceeds could be traced. Therefore, we affirm as modified.

## II. BACKGROUND

Prior to Daniel and Christina's marriage, they signed a premarital agreement. The premarital agreement defines the parties' "Separate Estate" and "Marital Estate" as follows:

3. Definition of Separate Estate. A party's "separate estate" shall mean any property in which such party has an interest and which is not expressly made a part of the "marital estate" as defined in paragraph 7. Without intending to limit the generality of the foregoing, the following items are specifically included in the "separate estate":

- 883 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
DIBUONO-GONZALEZ V. GONZALEZ
Cite as 32 Neb. App. 881

a. The property and income now owned by the party and set forth in that party's disclosure denominated Exhibit "A" or "B";

. . . .

c. Any increase or appreciation in value, of any property which constitutes the party's "separate estate", by reason of inflation, accumulated income, reduction of debt, or for any other reason;

d. Any income earned with respect to any property which constitutes the party's "separate estate"; and,

e. The "proceeds" of any such separate property or estate assets. As used in this Agreement, "proceeds" shall mean the money or property, acquired as a result of a sale or other disposition of all or any part of the property which constitutes the party's "separate estate".

. . . .

7. Marital Estate. The parties agree that the "marital estate" shall consist of any real or personal property acquired during the marriage by the parties in their joint names with rights of survivorship. The term "marital estate" shall not include any property listed on Exhibits "A" and "B" or any proceeds there from, or any income from said property, any increase or appreciation in value thereof, any increases in equity in the separate estate of either party by virtue of inflation, appreciation . . . . All property acquired during the marriage by either party in his or her individual name or as tenants in common shall be separate property or separate estate.

Exhibit A attached to the agreement listed the separate property, income, and debts of Christina, including the house in which she was living prior to the marriage; exhibit B attached to the agreement listed the separate property, income, and debts of Daniel, including "Retirement plan: Con Agra $1,000."

Daniel and Christina were married in 2008 and have four children. On March 31, 2022, Christina filed a complaint for dissolution of marriage.

- 884 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
DIBUONO-GONZALEZ V. GONZALEZ
Cite as 32 Neb. App. 881

### 1. Christina Seeks Protection Order

On March 22, 2022, Christina filed a petition and affidavit to obtain a domestic abuse protection order. She requested the district court grant her temporary custody of the four minor children for 90 days. Christina detailed that from March 17 to "present," Daniel exhibited "[e]rratic behavior (anger fits, yelling, verbal abuse) leading to Daniel drinking and Christina [and] children having to leave home." The affidavit noted that Daniel "threaten[ed] to kill family members, himself [and] coworkers through texts." Also, Daniel "[s]ent texts telling wife [and] kids to stay away because he was unable to cope and refused to leave home," which left Christina and the children homeless.

Christina also detailed events in the affidavit that occurred "[d]uring 2022." She claimed that Daniel "destroy[ed] property inside home (br[oke] home decor, urinat[ed] on clothing, thr[ew] things at me)." She also claimed Daniel refused to let her have her wheelchair and would leave it outside in the rain or would park long distances away from handicap areas. Christina alleged Daniel changed the passwords to their bank accounts and did not pay their bills. The district court granted Christina an ex parte protection order.

On April 14, 2022, the district court held a show cause hearing on the protection order. Christina testified that Daniel had physically assaulted her many times, including pushing her, hitting her in the face, and trying to choke her. Christina testified she left the family home on March 17, because of the events in January, including Daniel's behavior when he had been drinking. She explained that she left the house because she feared that Daniel was going to physically harm her or the children. She requested that her children remain parties to the protection order because they had witnessed much of the violence that occurred.

The district court temporarily continued the protection order and, upon an oral motion by Christina's counsel, set a hearing for temporary allowances in the dissolution case for the following Tuesday, April 19, 2022.

- 885 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
DIBUONO-GONZALEZ V. GONZALEZ
Cite as 32 Neb. App. 881

## 2. Continuation Hearing and Motion
### for Temporary Allowance

On April 19, 2022, Christina filed a written motion for a temporary order and notice of hearing for the same date. She requested the district court enter temporary orders "concerning the rights and responsibilities of the parties as it pertains to the real and personal property of the marital estate, the ongoing financial obligations of the parties, custody, parenting time, and spousal support."

A joint hearing was held on the protection order and the motion for temporary allowances. The district court determined that Christina had met her burden of proof for a protection order for herself, but not for her children. The protection order was to remain in effect for Christina for 1 year.

Regarding temporary allowances, Christina requested temporary sole legal and physical custody of the minor children with Daniel receiving supervised parenting time twice a week. She also requested alimony, spousal support, and continued exclusive use of the marital residence. Christina submitted multiple affidavits to support her requests, and her counsel emphasized that Daniel had been exhibiting dangerous and inappropriate behaviors, such as admitting to substance use, threatening suicide, and posting nude photographs of Christina in a shared family album that the children could access. Daniel's counsel argued Christina was embellishing the details and fabricating lies about Daniel to minimize her physical disabilities and ensure her access to the children. The district court took the matter under advisement.

In a written order, the district court provided Christina with sole legal and physical custody of the minor children subject to Daniel's parenting time. It ordered Daniel to pay temporary child support. It also ordered that in lieu of temporary alimony, Daniel would be responsible for all expenses associated with the marital home, Christina's car, and Christina and the children's cell phones. Christina was awarded temporary exclusive occupancy of the marital residence.

- 886 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
DIBUONO-GONZALEZ V. GONZALEZ
Cite as 32 Neb. App. 881

### 3. Dissolution Trial

The dissolution trial was held over 2 days in April and May 2023. Although the trial involved multiple issues, Daniel appeals only three of the district court's rulings. They involve (1) Christina's premarital house, (2) Daniel's premarital retirement account, and (3) physical custody of the children. Accordingly, our recitation of the trial evidence is limited to these three issues.

### (a) Marital Houses

At trial, Christina testified to the parties' housing throughout the marriage. Prior to marrying Daniel, Christina lived in a home she ultimately purchased from her mother, referred to as the "Madison house." Daniel was not listed on the deed, nor did he ever own the house as a joint tenant. In 2009, Christina sold the Madison house and received a check for $51,294.32. The proceeds were issued in a check made payable to "D.J. Gonzalez and Christina Dibuono-Gonzalez."

The parties then bought their second marital house, the "Monroe house." After selling the Monroe house, the parties moved into the "Springfield house." In 2019, Christina was hospitalized and received rehabilitative treatment for 2 months. She testified that after her hospitalization and rehabilitative treatment, living in the Springfield house was no longer feasible for her because she needed to live somewhere that was wheelchair accessible. The parties then moved into the current marital house, the "Molokai house."

Throughout the marriage, the parties had joint bank accounts. The parties bought each house with "Veteran loans" that only Daniel could access. Christina admitted that the Monroe, Springfield, and Molokai houses were owned by her and Daniel jointly. Christina acknowledged in her testimony that she had not provided any evidence at trial regarding the sale of the Springfield house or what was used for the downpayment on the Molokai house.

- 887 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
DIBUONO-GONZALEZ V. GONZALEZ
Cite as 32 Neb. App. 881

### (b) Retirement Account

At the time of trial, Daniel's retirement account had a balance of $86,000. He testified that in February 2023, he withdrew $40,000 from the account; therefore, prior to the withdrawal, the account had a balance of $126,000.

Daniel testified that he believed all of his retirement account should be considered nonmarital property under the premarital agreement. He claimed that regardless of how the account increased, the increase should remain separate from the marital estate.

### (c) Custody

Christina requested full legal and physical custody of the children in her proposed parenting plan because she did not believe that joint custody could work between her and Daniel. She also requested that the court require Daniel to continue paying child support.

Christina testified that both before and after her 2019 hospitalization, she was the children's primary caregiver. She explained she was responsible for getting them to school, making doctor's appointments, taking them to their grandmother's house, and overseeing their individualized education plans with the school. She was also responsible for signing them up for sporting events but acknowledged that Daniel did help with the boys' baseball team.

Christina testified she was "deathly afraid" of Daniel. She recalled that Daniel would "throw" the children around and threaten them as a form of discipline. Daniel would also attack Christina, and photographs were received into evidence that showed bruising on her body. Christina also offered pictures of her possessions that Daniel had destroyed or on which he had urinated.

Christina claimed that Daniel urinated on her and the children. She admitted this claim was not included in her affidavit for the protection order or at any of the subsequent hearings. She explained that she was unable to fill out the affidavit herself, so she dictated what happened to someone else who wrote

- 888 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
DIBUONO-GONZALEZ V. GONZALEZ
Cite as 32 Neb. App. 881

it down. She did not know how that claim was left out of the affidavit.

Daniel requested that the district court order joint physical custody of the minor children. He claimed it would be in the minor children's best interests to have equal time with their father.

Daniel has been convicted of driving under the influence of alcohol twice. In January 2022, he described himself as "[v]iolent" and as a "ticking time [b]omb." Daniel also admitted that the last time he "blacked out" from alcohol was in March. He provided evidence that he has not had any noncompliant tests regarding his sobriety since he last blacked out.

Daniel admitted that he had "been physical" with Christina. Some of Daniel's handwritings were admitted into evidence, in which he acknowledged he has problems with alcohol abuse, domestic abuse, and anger. However, at trial, Daniel denied all allegations in Christina's affidavit seeking the protection order and the allegations in her request to renew the protection order.

Daniel acknowledged that he believes in physically disciplining his children; however, he denied ever "picking them up and throwing them against [a] wall." Daniel testified that his physical discipline was limited to giving the children "a little upside the head or on their bottom." He denied breaking any of Christina's possessions and denied urinating on them.

Daniel testified that he has been seeking help for his mental health issues and alcoholism. He attends neurofeedback treatment twice a week. Daniel also started seeing a psychiatrist and was prescribed medication. He testified that he also suffers from numerous physical ailments, such as fibromyalgia, for which he receives disability pay through the Department of Veterans Affairs.

### 4. District Court's Decree of Dissolution

As to the three issues on appeal, the district court made the following determinations. First, it found that the proceeds

- 889 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
DIBUONO-GONZALEZ V. GONZALEZ
Cite as 32 Neb. App. 881

Christina received from the sale of the Madison house were part of her separate estate and subtracted them from the equity in the Molokai house. Second, it found that only $1,000 of Daniel's retirement account was part of his separate estate and determined $125,807 of the account belonged to the marital estate. Third, it awarded Christina sole legal and physical custody of the minor children, subject to Daniel's parenting time.

Daniel appeals.

### III. ASSIGNMENTS OF ERROR

Daniel assigns that the district court erred in (1) classifying the proceeds Christina received from the sale of the Madison house as nonmarital and (2) classifying Daniel's retirement fund as a marital asset aside from the $1,000 provided in the premarital agreement. Daniel also assigns the district court erred in determining it was in the children's best interests to award Christina sole physical custody.

### IV. STANDARD OF REVIEW

[1] In an action for the dissolution of marriage, an appellate court reviews de novo on the record the trial court's determinations of custody, child support, property division, alimony, and attorney fees; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion. *Mamot v. Mamot*, 283 Neb. 659, 813 N.W.2d 440 (2012).

[2] As a contract, an antenuptial agreement is governed by the same principles that are applicable to other contracts, but is subject to the particular statutory requirement that an antenuptial agreement must be based on fair disclosure. *Simons v. Simons*, 312 Neb. 136, 978 N.W.2d 121 (2022).

[3] When the terms of a contract are clear, a court may not resort to rules of construction, and terms are accorded their plain and ordinary meaning as an ordinary or reasonable person would understand them. *Id*. In such a case, a court shall seek to ascertain the intention of the parties from the plain language of the contract. *Id*.

- 890 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
DIBUONO-GONZALEZ V. GONZALEZ
Cite as 32 Neb. App. 881

## V. ANALYSIS

### 1. Property Classification

[4] Under Nebraska's dissolution statutes, "The purpose of a property division is to distribute the marital assets equitably between the parties." Neb. Rev. Stat. § 42-365 (Reissue 2016). Equitable distribution of property is a three-step process: The district court (1) classifies the parties' property as marital or nonmarital, setting aside nonmarital property to the party who brought that property to the marriage; (2) values the marital assets and marital liabilities of the parties; and (3) calculates and divides the net marital estate between the parties in accordance with the principles contained in § 42-365. See *Osantowski v. Osantowski*, 298 Neb. 339, 904 N.W.2d 251 (2017).

[5,6] All property accumulated and acquired by either spouse during the marriage is part of the marital estate, unless it falls within an exception to this general rule. *Stephens v. Stephens*, 297 Neb. 188, 899 N.W.2d 582 (2017). However, spouses are able to contract around the general rules of equitable division by using a premarital agreement. *Simons v. Simons, supra*.

Neb. Rev. Stat. § 42-1004 (Reissue 2016) permits parties to a premarital agreement to contract with respect to, among other things, "[t]he rights and obligations of each of the parties in any of the property of either or both of them whenever and wherever acquired or located" and "[t]he disposition of property upon separation, marital dissolution, death, or the occurrence or nonoccurrence of any other event." Under Nebraska's Uniform Premarital Agreement Act (the Act), Neb. Rev. Stat. § 42-1001 et seq. (Reissue 2016), property is defined as "an interest, present or future, legal or equitable, vested or contingent, in real or personal property, including income and earnings." § 42-1002(2). The parties stated in their premarital agreement that they desired to utilize Neb. Rev. Stat. § 42-1001 et seq. (Reissue 2016) to "limit and determine the interest and rights in the property or income of the other, which is owned now by the other and which may be acquired

- 891 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
DIBUONO-GONZALEZ V. GONZALEZ
Cite as 32 Neb. App. 881

through purchase, gift or inheritance in the future." In this appeal, neither party disputes the validity of the premarital agreement; thus, the question before us is whether the district court properly interpreted the premarital agreement in classifying the parties' property.

Exhibit A attached to the premarital agreement identified the Madison house as Christina's separate asset. Exhibit B attached to the premarital agreement identified "Retirement plan: Con Agra $1,000" as Daniel's separate asset. Paragraph 3.e. of the agreement, included in its definition of a party's "separate estate" the term "proceeds," which included money "acquired as a result of a sale . . . of . . . property which constitutes the party's 'separate estate.'" And paragraph 3.c. included in its definition of separate estate "[a]ny increase or appreciation in value, of any property which constitutes the party's 'separate estate', by reason of inflation, accumulated income . . . or for any other reason."

On the other hand, "Marital Estate" in paragraph 7 of the premarital agreement was defined to "consist of any real or personal property acquired during the marriage by the parties in their joint names with rights of survivorship." The property listed in exhibits A and B and the proceeds, income, or appreciation in value made from that property were excluded from the marital estate. Also excluded from the marital estate, as stated in paragraph 7, was "[a]ll property acquired during the marriage by either party in his or her individual name or as tenants in common."

Pertinent to Daniel's appeal, both the Madison house and his retirement account were separate property of the respective party at the time of marriage. We will separately address whether the district court erred in determining whether each remained so.

### (a) Madison House

Daniel argues the district court erred in crediting the proceeds from the Madison house as Christina's nonmarital

- 892 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
DIBUONO-GONZALEZ V. GONZALEZ
Cite as 32 Neb. App. 881

property. He argues that despite the premarital agreement, it was still Christina's responsibility to trace the proceeds of the Madison house because those proceeds were spent elsewhere, including roughly $26,000 on the Monroe house, which was eventually sold, and the parties bought two other houses after that. There is no dispute that the Madison house and its subsequent proceeds were nonmarital property.

[7,8] Any given property can constitute a mixture of marital and nonmarital interests; a portion of an asset can be marital property while another portion can be separate property. *White v. White*, 304 Neb. 945, 937 N.W.2d 838 (2020). The burden of proof to show that property is nonmarital remains with the person making the claim. *Gangwish v. Gangwish*, 267 Neb. 901, 678 N.W.2d 503 (2004).

In *Gangwish*, the Nebraska Supreme Court found no abuse of discretion by the trial court in denying a husband premarital credit for the downpayment on a home when the proceeds were allegedly used for subsequent real estate purchases without evidence that the original proceeds could be traced. The court held that normally, a party would be entitled to credit for the amount of premarital funds used for the purchase of a marital residence when that residence is sold. See *id*. But where those proceeds were used to purchase a second residence, which was then sold and the proceeds loaned to a third-party entity that then paid for the construction of a third home, it was incumbent upon the party seeking premarital credit to produce evidence tracing those proceeds. The court explained:

> [The husband], however, did not present evidence that his premarital contribution retained its status as separate property after the parties sold their first home. More significantly, even if we were to assume [the husband] could trace his personal, premarital interest from the parties' first home to their second, [he] presented no evidence to document how his separate interest in the proceeds from the second home were in fact loaned to [the third-party entity]. In fact, outside of [the

- 893 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
DIBUONO-GONZALEZ V. GONZALEZ
Cite as 32 Neb. App. 881

husband's] testimony, the record is devoid of evidence which establishes that *any* of the proceeds from the sale of the parties' second home were in fact loaned to [the third-party entity].

*Id*. at 908, 678 N.W.2d at 511 (emphasis in original).

Here, the district court abused its discretion by crediting Christina with the proceeds from the Madison house sale because Christina did not meet her burden in tracing the funds. Under the terms of the premarital agreement, the proceeds from the Madison house sale, $51,294.32, were a nonmarital asset. Although Daniel argues in his brief that $26,121.05 of those proceeds were applied to the Monroe house, he relies upon the first page of exhibit 10, which was specifically excluded when exhibit 10 was offered and received into evidence. Christina testified that she received $51,294.32 from the sale of the Madison house but did not testify how those proceeds were applied. The third page of exhibit 10 reflects a payment of $25,173.27 to "Daniel J. Gonzalez and Christina M. DiBuono-Gonzalez" from a title company with the notation that it was a "[r]efund of overpayment." Even if we were to surmise that the remaining $26,121.05 was applied toward the purchase of the Monroe house, there is no evidence that this amount was later applied to the Springfield house and then the Molokai house, nor is there evidence of where the proceeds of the $25,173.27 check went. The check was made payable to both parties, and the evidence indicates they had a joint checking account.

In awarding Christina a credit of $51,294.32 against the equity of the Molokai house, the district court impliedly found that the Madison house proceeds were used to build equity in the Molokai house; however, the record is devoid of evidentiary support. Under *Gangwish v. Gangwish, supra*, nonmarital property must be traced back to its origin. It was Christina's burden, as the party claiming the proceeds of the Madison house, to prove that equity in the Molokai house was traceable to the proceeds from the Madison house. This she failed to do,

- 894 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
DIBUONO-GONZALEZ V. GONZALEZ
Cite as 32 Neb. App. 881

and the district court abused its discretion in finding otherwise. We vacate that portion of the decree crediting Christina with a $51,294 credit in the Molokai house and add that amount to the marital equity in the Molokai house for a total marital equity in the Molokai house of $54,761. We award that amount to Christina and adjust the equalization payment accordingly. This results in a subtotal of $58,011 awarded to Christina ($54,761 + $3,250) with a subtotal amount to balance of $33,898 ($125,807 − $58,011 = $67,796 ÷ 2 = $33,898). Including the amount owed under the temporary order of $5,588.35, Daniel is ordered to transfer $39,486.35 to Christina by qualified domestic relations order.

(b) Daniel's Retirement Account

Daniel argues the district court erred by classifying only $1,000 of his retirement fund as nonmarital. He contends that under the terms of the premarital agreement, the entirety of his retirement account should have been classified as a nonmarital asset. We disagree.

Absent the premarital agreement, Daniel's nonmarital interest would be limited to his initial investment and any passive growth he could prove; however, spouses are able to contract around the general rules of equitable division by using a premarital agreement. See *Simons v. Simons*, 312 Neb. 136, 978 N.W.2d 121 (2022). The premarital agreement classified Daniel's retirement account as part of his separate estate because it was listed in exhibit B. Furthermore, the premarital agreement included in its definition of separate estate "[a]ny increase or appreciation in value, of any property which constitutes the party's 'separate estate.'" However, the premarital agreement does not specifically address how contributions from earnings made to a party's separate estate should be classified.

In rejecting a husband's claim that because the Act defined property to include income and earnings, all increases in the value of his savings plan should not be considered marital

- 895 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
DIBUONO-GONZALEZ V. GONZALEZ
Cite as 32 Neb. App. 881

property, the Supreme Court in *Sitz v. Sitz*, 275 Neb. 832, 837-38, 749 N.W.2d 470, 475 (2008) explained:

[The husband] asserts that the intent of the premarital agreement was that [the wife] would not share in the benefits of his . . . savings plan. He argues that because the savings plan was described in the premarital agreement and because the Uniform Premarital Agreement Act describes "property" as an interest, present or future in real or personal property, including income and earnings, all increases in value of the . . . savings plan should not be considered marital property. See Unif. Premarital Agreement Act, 9C U.L.A. 39 (2001). We disagree.

The definition of "property" in the Uniform Premarital Agreement Act is simply a definition of the term as it is used in the act. However, that definition was not incorporated into the parties' premarital agreement. The premarital agreement stated that the parties agreed to disclaim any right to or interest in property accumulated "prior to" the marriage. The agreement said nothing about property acquired during the marriage, and the record reflects that the parties combined their incomes in a joint account and acted as if both parties had a right to the money.

As a general rule, all property accumulated and acquired by either spouse during the marriage is part of the marital estate, unless it falls within an exception to the general rule. *Davidson v. Davidson*, 254 Neb. 656, 578 N.W.2d 848 (1998). [The husband's] contributions to the savings plan were made with deductions from his . . . paycheck, which was marital property. Accordingly, the contributions to the savings plan made during the marriage and the returns earned during the marriage were subject to division by the trial court. Thus, because the court merely awarded [the wife] one-half of the benefits earned during the parties' marriage, we find no abuse of discretion.

- 896 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
DIBUONO-GONZALEZ V. GONZALEZ
Cite as 32 Neb. App. 881

Here, the parties stated in their agreement that they desired to use the Act to determine the interest and rights in the property or income of the other, but only to the extent it was "owned now by the other and which may be acquired through purchase, gift or inheritance in the future." They did not reference the Act's application to income acquired in the future through earnings, nor did they specifically adopt the Act's definition of property. The parties also did not specifically identify property acquired through their earnings or employment as separate property in their agreement. Cf. *Cook v. Cook*, 26 Neb. App. 137, 140, 918 N.W.2d 1, 5 (2018) (upholding provision that kept separate "'all property which shall come into their possession as the result of each party's work and labor, investments, inheritance or otherwise'").

Paragraph 7 of the premarital agreement excluded from the marital estate "[a]ll property acquired during the marriage by either party in his or her individual name or as tenants in common." Arguably, this would include income that the parties earned through their employment; however, as in *Sitz v. Sitz, supra*, the evidence reflects that the parties shared joint checking and savings accounts, as evidenced by Christina's testimony that she was "shut out of the [checking and savings] account[s]" when she left. The parties' joint checking account statement reflects that Daniel's paychecks were deposited by his employer into this account. The parties agreed that the marital estate would include property acquired during the marriage in their joint names with rights of survivorship. Daniel cannot shield his earnings, which would otherwise be marital property, by funneling them into his retirement account held solely in his name.

Accordingly, Daniel's contributions to his retirement plan made during the marriage and the returns earned during the marriage were subject to division by the district court. And because Daniel presented no evidence reflecting to what extent the premarital value of the retirement account grew due to passive growth, the district court did not abuse its discretion

- 897 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
DIBUONO-GONZALEZ V. GONZALEZ
Cite as 32 Neb. App. 881

in finding that only $1,000 of the retirement account was Daniel's separate property.

## 2. Custody

Daniel argues the district court abused its discretion in awarding Christina sole physical custody of the minor children because it is not in the children's best interests. He contends that "[w]hile the facts regarding Daniel's behavior may be in great dispute, the lack of credibility demonstrated on the record by Christina should render the [district] court's reliance on her testimony as untenable and depriving Daniel of a just result." Brief for appellant at 18. He points out that Christina's lack of credibility is demonstrated by her testimony that Daniel urinated on her and the children, yet that claim was not in either protection order request or made at the previous hearings. He concludes that because Christina first made this claim at trial, either Christina was "ambivalent that [she] did not report this matter to authorities" or she fabricated the claim. *Id.*

[9] In determining child custody issues, the overriding consideration is the best interests of the children. See *Donald v. Donald*, 296 Neb. 123, 892 N.W.2d 100 (2017). In evaluating the children's best interests, courts are directed to consider what parenting arrangement will best provide for children's safety, emotional and physical health, and stability. See Neb. Rev. Stat. § 43-2923(1) (Reissue 2016).

To determine the best interests of a child, a court must consider, at a minimum: (1) the relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing; (2) the desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning; (3) the general health, welfare, and social behavior of the minor child; (4) credible evidence of abuse inflicted on any family or household member; and (5) credible evidence of child abuse or neglect or domestic partner abuse. See § 43-2923(6). Other pertinent factors a court may consider in

- 898 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
DIBUONO-GONZALEZ V. GONZALEZ
Cite as 32 Neb. App. 881

determining the best interests of a child include the moral fitness of the child's parents; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and the parental capacity to provide physical care and satisfy educational needs of the child. See *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004).

Christina explained in her testimony why she first made the urination claim at trial rather than in the previous hearings or requests for protection orders. She detailed that she cannot write, so when she was trying to get the protection order, she had to have another person fill out the affidavit for her while she dictated. She did not know how her claim that Daniel urinated on her and the children was left out of the affidavits for the protection orders.

Even without considering the credibility of Christina's claim that Daniel urinated on her and the children, there is ample evidence to support the district court's conclusion. The district court did not rely on Christina's statements about Daniel's urinating on the children in reaching its conclusion. Rather, it relied on Daniel's own admissions in his handwritten notes, text messages he sent, and other protection orders issued against Daniel based on his conduct. Furthermore, there was sufficient evidence to support a protection order against Daniel on behalf of three people, which, as the district court noted, shows a troubling, continuing course of conduct. Daniel's argument is without merit; thus, we hold the district court did not abuse its discretion in awarding Christina sole legal and physical custody of the minor children.

## VI. CONCLUSION

For the foregoing reasons, we affirm as modified and order Daniel to transfer the sum of $39,486.35 to Christina by qualified domestic relations order. We affirm the district court's custody determination of the minor children.

AFFIRMED AS MODIFIED.