IN THE NEBRASKA COURT OF APPEALS

MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

PATACH V. PATACH

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

JESSICA J. PATACH, APPELLEE,

V.

COLIN K. PATACH, APPELLANT.

Filed January 27, 2026.    No. A-25-349.

Appeal from the District Court for Douglas County: DEREK R. VAUGHN, Judge. Affirmed in part, and in part vacated.

D.C. "Woody" Bradford III, of Houghton Bradford Whitted, P.C., L.L.O., for appellant.

Amit Mukherjee, of Fraser Stryker, P.C., L.L.O., for appellee.

MOORE, BISHOP, and WELCH, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Colin K. Patach appeals from the Douglas County District Court's decree that dissolved his marriage to Jessica J. Patach. Colin claims the district court erred by finding he failed to meet his burden to establish that his $80,000 down payment on the parties' marital residence came from a nonmarital source. We agree, and we vacate that portion of the decree. As a result, neither party will owe an equalization payment to the other. The remainder of the decree is affirmed.

## II. BACKGROUND

Colin and Jessica were married in 2015; their son was born in 2016. Prior to their marriage, the couple signed a premarital agreement. The agreement defines the parties' "marital estate" and "separate estate" as follows:

- 1 -

(c) The term "marital estate" as used in this Agreement shall mean the property acquired by the parties during the marriage (i) solely by their joint efforts; or (ii) titled in both Husband and Wife's names, whether as joint tenants with rights of survivorship or as tenants in common. The term "marital estate" shall also mean any property which may be subsequently transferred by one party to the other, whether as joint tenants with rights of survivorship or as tenants in common . . . .

(d) The term "separate estate" as used in this Agreement shall mean (i) any property listed on Exhibits "A" and "B" or any proceeds therefrom, or any increase or appreciation in the value thereof . . .; (ii) any increase in equity by virtue of the reduction in any indebtedness listed on Exhibits "A" and "B", even though the reduction of such indebtedness may be from personal income or marital income, from either party; (iii) any property received by gift, devise or inheritance; and (iv) any property acquired during the marriage by Husband or wife in his or her sole name.

Exhibit A attached to the premarital agreement lists the separate assets and liabilities of Colin. In addition to three vehicles identified as assets, Colin's list included a home located on "N. 144th Ave." It was valued at $134,700, with a liability of "Approx" $130,000. Exhibit B identifies Jessica's assets as a trust fund and a vehicle. No liabilities are indicated. At no point in the proceedings below did either party contest the validity of the premarital agreement.

On September 19, 2023, Jessica filed a complaint for dissolution of marriage. According to the pleadings, both parties lived at a residence on "Grebe Street" from July 2021 until the time dissolution proceedings were initiated, and they had previously lived at the property on N. 144th Avenue identified on Colin's Exhibit A described above.

## 1. Dissolution Trial

On appeal, Colin takes issue with the district court's characterization of certain proceeds as marital property. Colin specifically contends he made an $80,000 down payment on the parties' marital home located on Grebe Street with proceeds acquired from the sale of his previous, nonmarital residence located on North 144th Avenue. He claims that the court erred by determining that he failed to carry his burden of showing those proceeds came from a nonmarital source. Our recitation of the evidence adduced at the 1-day dissolution trial relates only to that narrow issue.

### (a) Pleadings

Jessica's complaint alleged that the parties' son had resided with them at two addresses since his birth in 2016. According to the complaint, from 2016 to July 2021, the family lived in Colin's home on North 144th Avenue. However, in July 2021, the parties moved to the home on Grebe Street. The complaint also alleged that both Colin and Jessica resided at the Grebe Street home at the time dissolution proceedings began. Colin admitted all these allegations in his answer.

### (b) Premarital Agreement

A copy of the parties' premarital agreement was received by the district court at trial without objection. The agreement expressly provides that Colin and Jessica "intend to preserve

their separate estates" and "waive" any right "[t]o the division of the other party's separate estate." As mentioned previously, Exhibit A, which was attached to the agreement, listed a home located on North 144th Avenue as one of Colin's separate assets.

## (c) Parties' Testimony

According to Colin, Jessica attended law school during "the first half of [their] marriage." Jessica had "moved into" Colin's "house," and they lived there for the duration of her schooling. Regarding marital finances, Colin stated that Jessica "did her own finances," and he "had [his] own finances." They each had their own bank accounts; there was no joint account. Colin "took care of most of the house expenses before [they] moved to . . . the Grebe Street address," but that "changed when [they] got the bigger house." After Colin "put the down payment down" on the new house, he acknowledged that Jessica then "paid for it exclusively." Both parties established that Colin made an $80,000 down payment on the Grebe Street residence during the marriage.

On cross-examination by Colin's counsel, Jessica agreed that Colin made "an $80,000 downpayment" on the Grebe Street home. She indicated that this money came "[f]rom the sale of the prior house." According to Jessica, this prior home had "jumped" "at least $90,000 in equity from the time" she and Colin "got married until the time [they] sold it." After selling this home and applying $80,000 of the proceeds toward the Grebe Street residence, Jessica stated Colin "pocketed the rest." She estimated the amount to be around "[$]30,000-plus."

Jessica requested all marital assets be split "on a 50/50 basis" "offset" by "any payments or equity owed to" Colin. During closing arguments, Jessica's counsel made statements that Colin was "entitled to" "equity in the [Grebe Street] house."

## 2. DISTRICT COURT'S DECREE

On February 5, 2025, the district court entered a decree dissolving the marriage between the parties, determining the custody of their son, and dividing marital assets and liabilities. Pertinent to the controversy before us, the court awarded Jessica the Grebe Street home "free and clear of any interest" Colin had in the real property. But the court also found it "was purchased with $80,000" by Colin with proceeds "from the sale of a house." However, it concluded that Colin "ha[d] not met his burden to establish that the $80,000 was a non-martial [sic] asset."

The decree also apportioned other assets and liabilities that are not disputed on appeal. Each party was "awarded any pension, retirement, and bank accounts in their respective names" and other "personal property" "in their respective possessions." The district court identified a "2019 Chevy Colorado" as a marital asset "with an encumbrance of approximately $28,000." Colin was awarded that vehicle, and Jessica was ordered to "assume the loan on the vehicle and pay off the remaining balance." Jessica was also assigned and ordered to pay $57,794 for a marital solar panel loan and $82,334.92 for a student loan used on marital expenses (Jessica received a scholarship to cover her law school tuition, thus she testified that the loan was used to pay for various marital living expenses while she was in school). Colin was ordered to pay $4,556 in "unreimbursed expenses for the [parties'] minor child."

The district court's decree contained the following equalization calculation:

> The Court finds that the Mohela Student Loan was used for marital expenses and therefore is a martial [sic] liability that shall be equitably divided. Furthermore, the Court

finds that the Gateway Loan for Solar Panels is a martial [sic] debt and shall be equitably divided. The martial [sic] debt in this matter has been disproportionately assigned the Plaintiff. There is approximately $100,172 ($415,000 minus $314,828) equity in the martial [sic] home. The total amount of debt the Plaintiff is assuming is $168,128.92. If the Court applies the equity in this matter of $100,172 the balance left is $67,956.92. The Defendant is ordered to pay to the Plaintiff an equalization payment in the amount of $33,978,46. The Defendant shall remit payment in the Clerk of the District Court within twenty-four (24) months after the entry of this Decree. The Clerk of the District Court shall remit full payment to the Plaintiff upon full receipt of same.

### 3. COLIN'S MOTION FOR NEW TRIAL

Nine days after the district court entered its decree, Colin filed a motion for new trial. In the motion, he asserted the court "erred in finding" that he "ha[d] not met his burden to establish that the $80,000 was a nonmarital asset." To support his assertion, Colin cited to an April 2024 deposition of Jessica where she allegedly stated that "we sold the original house, and there was $120,000 in profit. He put $80,000 on this house, and he took the remainder of that money." However, Jessica's deposition does not appear in our record. Colin argued that "[f]rom the inception of this litigation the parties have accepted the fact that [he] made an $80,000 down payment on their present home," and that it was not until Jessica's "final argument," that she suggested that "'the parties had been married for several years prior to the purchase of the [Grebe Street] home," and "there was no evidence presented that demonstrated the downpayment of $80,000 was pre-marital.'"

A hearing on Colin's motion was held on March 7, 2025. At the hearing, Colin argued that Jessica, in her deposition, "admitted" that he had made "the complete . . . downpayment." He further asserted there could "be no question" that the down payment was made "out of his own account, since the parties had separate accounts." Colin lastly informed the district court that he "ha[d] evidence" in his possession "relat[ing] to the specific payments," and was "prepared to offer" it, if the court needed further proof. Jessica countered, asserting that Colin's motion failed to allege any cognizable basis for a new trial under Nebraska statutes. She argued Colin's "trial strategy" "did not succeed" and that he had an "opportunity to introduce additional evidence to substantiate the claim asserted in the motion" at trial.

The district court afforded the parties an opportunity to "submit any briefs and/or additional closing arguments." On April 15, 2025, the court entered an order denying Colin's motion for new trial.

Colin appeals.

### III. ASSIGNMENTS OF ERROR

Colin first assigns, restated, that the district court erred by concluding he had not met his burden to establish that the $80,000 paid toward the Grebe Street home came from a nonmarital source. He next assigns, "Did the district court err when it re-opened the record by allowing [the] parties to submit briefs on [Colin's] motion for new trial[?]"

- 4 -

## IV. STANDARD OF REVIEW

In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Doerr v. Doerr*, 306 Neb. 350, 945 N.W.2d 137 (2020). This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees. *Id.*

A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

## V. ANALYSIS

### 1. PROPERTY CLASSIFICATION

Colin's main contention on appeal is that the district court's factual findings contradict its conclusion regarding the legal classification of the disputed proceeds. In its decree, the court found that (1) Colin made an $80,000 down payment on the Grebe Street residence and (2) this money came from the sale of "a house." Nonetheless, it concluded Colin failed to prove the $80,000 was separate property.

In his brief, Colin asserts that the "[d]istrict [c]ourt cannot make a finding that [the] $80,000 was from" him "and then also assert that" he "did not meet his burden to establish that the $80,000 was a non-marital asset." Brief for appellant at 10. He argues that the "evidence at trial showed there were no other homes that were sold to contribute to the purchase of the" Grebe Street "home except for the" North 144th Avenue residence "identified in the [parties'] premarital agreement." *Id.*

For the reasons discussed next, we conclude the district court erred in finding that Colin failed to meet his burden of proof to establish that the $80,000 down payment on the Grebe Street residence came from his separate property.

#### (a) Relevant Provisions of Premarital Agreement

Under Nebraska's dissolution statutes, "[t]he purpose of a property division is to distribute the marital assets equitably between the parties." Neb. Rev. Stat. § 42-365 (Reissue 2016). Equitable distribution of property is a three-step process. The district court (1) classifies the parties' property as marital or nonmarital, setting aside nonmarital property to the party who brought that property to the marriage; (2) values the marital assets and marital liabilities of the parties; and (3) calculates and divides the net marital estate between the parties in accordance with the principles contained in § 42-365. *Dibuono-Gonzalez v. Gonzalez*, 32 Neb. App. 881, 7 N.W.3d 672 (2024). The case before us falls within the first step. The extent to which property is marital versus nonmarital presents a mixed issue of law and fact. *Stava v. Stava*, 318 Neb. 32, 13 N.W.3d 184 (2024). The manner and method of acquisition involve questions of fact, but the classification of the property under those facts is a legal question and not a matter of the court's discretion. *Id.*

All property accumulated and acquired by either spouse during the marriage is part of the marital estate, unless it falls within an exception to this general rule. *Dibuono-Gonzalez v. Gonzalez, supra.* However, spouses are able to contract around the general rules of equitable

division by using a premarital agreement. *Simons v. Simons*, 312 Neb. 136, 978 N.W.2d 121 (2022). Neb. Rev. Stat. § 42-1004 (Reissue 2016) permits parties to a premarital agreement to contract with respect to, among other things, "[t]he rights and obligations of each of the parties in any of the property of either or both of them whenever and wherever acquired or located" and "[t]he disposition of property upon separation, marital dissolution, death, or the occurrence or nonoccurrence of any other event."

Exhibit A attached to the parties' premarital agreement expressly identified the residence on North 144th Avenue as Colin's separate property. Section 1(d) of the agreement defined a party's "separate estate" as "any property listed on Exhibit[] 'A' . . . or any *proceeds* therefrom." (Emphasis supplied). The term "proceeds," as defined in section 1(b) of the agreement, means "property acquired from money derived from the sale of property . . . owned by one of the parties or as a result of an exchange of property, or by a combination thereof." Further, the term "separate estate" is defined to include "any increase in equity by virtue of the reduction in any indebtedness listed on Exhibits 'A' and 'B', even though the reduction of such indebtedness may be from personal income or marital income, from either party[.]"

Therefore, based on the plain language of the premarital agreement, any proceeds that were obtained from the sale of Colin's separate home on North 144th Avenue would remain his separate property, including any increased equity that resulted from reductions in indebtedness due to payments made with personal or marital income. And if these proceeds were used to make a down payment on the marital home on Grebe Street, they would remain a nonmarital asset, so long as Colin provided sufficient evidence tracing those separate funds. See *Dibuono-Gonzalez v. Gonzalez, supra* (any given property can constitute a mixture of marital and nonmarital interests; the burden of proof to show that property is nonmarital remains with the person making the claim). Unless an exception applies, the burden of proof in civil cases requires only the greater weight of the evidence. *Backhaus v. Backhaus*, 318 Neb. 891, 20 N.W.3d 81 (2025). The greater weight of the evidence means evidence sufficient to make a claim more likely true than not true. *Id.* Thus, at trial, Colin had to show by a greater weight of the evidence that the $80,000 used as a down payment on the Grebe Street home were proceeds from the sale of his separate residence on North 144th Avenue.

### (b) Evidence at Trial

At trial, the evidence showed that Colin brought a home located at North 144th Avenue into the marriage, and this residence along with any proceeds derived from its sale, were intended to remain a part of his separate estate under the terms of the parties' premarital agreement. Further, both parties testified that Colin made an $80,000 down payment on the Grebe Street home, and Jessica conceded these funds came "[f]rom the sale of the prior house."

In its decree, the district court made findings consistent with this testimony. It determined that Colin made an $80,000 down payment on the Grebe Street home and that this money came from the sale of "a house." Yet the court concluded Colin failed to meet his "burden to establish the $80,000 was a non-martial [sic] asset." The only evidence of a prior "house" was the one located on North 144th Avenue.

In her brief, Jessica argues that "the Nebraska Supreme Court has consistently emphasized the necessity of documentary evidence to establish the nonmarital character of property." Brief for

appellee at 9. She continues that "[i]n the present case, the value of the down payment was referenced only indirectly through testimony, and Colin failed to present, offer, or alleged [sic] any evidence to establish its premarital character." *Id.* However, it is well-established that a nonmarital interest in property may be established by credible testimony. *Burgardt v. Burgardt*, 304 Neb. 356, 934 N.W.2d 488 (2019). While documentary evidence may be more persuasive, it is not absolutely required. *Id.* Thus, Colin could establish the nonmarital character of the $80,000 down payment by credible testimony alone. Of course, though, triers of fact have the right to test the credibility of witnesses by their self-interest and to weigh it against the evidence, or the lack thereof. *Id.* Further, evidence not directly contradicted is not necessarily binding on the triers of fact and may be given no weight where it is inherently improbable, unreasonable, self-contradictory, or inconsistent with facts or circumstances in evidence. *Id.*

Here, the district court appeared to accept the parties' collective testimony that Colin made an $80,000 down payment on the Grebe Street residence and Jessica's individual testimony that these funds came "[f]rom the sale of the prior home." While it is true that no witness expressly identified the address of this "prior home" at trial, the pleadings provided conclusive evidence. The pleadings in this case reflect that from 2016 to July 2021 the parties lived in Colin's home on North 144th Avenue before moving to the Grebe Street residence. Therefore, the "prior home" referred to by Jessica, as reflected by the pleadings, was Colin's separate residence. The pleadings in a cause are, for the purposes of use in that suit, not mere ordinary admissions but judicial admission and, as such, are a waiver of all controversy insofar as the opponent may desire to take advantage of them. *Wood v. Bass*, 30 Neb. App. 391, 969 N.W.2d 678 (2021). A judicial admission is a formal act done in the course of judicial proceedings which is a substitute for evidence, thereby waiving or dispensing with the production of evidence by conceding for the purpose of litigation that the proposition of fact alleged by the opponent is true. *Watson v. Pick*, 31 Neb. App. 952, 992 N.W.2d 754 (2023).

Accordingly, after our de novo review of the record, we find the district court abused its discretion in concluding that Colin failed to meet his burden of proof that the $80,000 down payment on the Grebe Street residence came from nonmarital funds. The testimony relied upon by the court, along with the parties' premarital agreement and the pleadings, show that Colin's $80,000 came from the sale of his residence on North 144th Avenue. Under Colin and Jessica's premarital agreement, this home and its proceeds were to remain a part of Colin's separate estate.

(c) Impact on Equalization

In its decree, the district court awarded the Grebe Street home to Jessica, which was valued at its purchase price of $415,000. It had a mortgage of $314,825. Thus, the court determined there was $100,172 of marital equity in the home. It then apportioned $168,128.92 in marital debts to Jessica (zero marital debt to Colin) and stated that the marital debt "in this matter has been disproportionately assigned" to Jessica. It then subtracted the home equity ($100,172) from the marital debt ($168,128.92) and determined that "the balance left is $67,956.92." The court ordered Colin to make an equalization payment of $33,978.46 ($67,956.92 ÷ 2).

However, in light of our conclusion that Colin should have had $80,000 of the Grebe Street equity set off to him because of his nonmarital down payment, we must recalculate the allocation of the assets and liabilities between the parties. If we first set off Colin's $80,000 of nonmarital

- 7 -

equity in the Grebe Street residence, that leaves only $20,172 of marital equity in that property. Therefore, under the court's original formula, the calculation of an equalization payment would be as follows:

Jessica
$20,172 (home equity)
- [$168,128.92] (marital debts)
= [$147,956.92] net marital estate

To equalize the marital estate, as the district court sought to do, the marital debt would be divided in half between the parties, with each being responsible for $73,978.46. Colin would therefore owe that amount to Jessica since she was assigned and was responsible for paying the entirety of that debt. The decree also ordered Colin to pay $4,556 to Jessica for unreimbursed costs he had failed to pay during the proceedings. Thus, the total amount owed by Colin to Jessica is $78,534.46. When setting off the $80,000 owed to Colin for his nonmarital contribution to the Grebe Street house against the $78,534.46 he owes to Jessica for his share of the marital debts, the amount is close enough that neither party should owe any equalization payment to the other.

We therefore vacate the portion of the district court's decree ordering Colin to pay to Jessica an "equalization payment in the amount of $33,978.46."

## 2. REMAINING ASSIGNMENT OF ERROR

Colin also asks us to consider whether "the district court err[ed] when it re-opened the record by allowing [the] parties to submit briefs on [his] motion for new trial." Brief for appellant at 6. However, since Colin's motion for new trial focused on the $80,000 down payment issue raised here, and we have already concluded that the $80,000 from Colin's premarital property should have been set off to him, it is not necessary to address this alleged error. An appellate court is not obligated to engage in an analysis that is not needed to adjudicate the controversy before it. *Henderson State Co. v. Garrelts*, 319 Neb. 485, 23 N.W.3d 444 (2025).

## VI. CONCLUSION

For the foregoing reasons, we vacate the portion of the district court's February 5, 2025, decree that ordered Colin to pay to Jessica "an equalization payment in the amount of $33,978.46." The remainder of the decree is affirmed.

AFFIRMED IN PART, AND IN PART VACATED.